| | |
|---|---|
| RETURN DATE: JULY 5, 2016 | SUPERIOR COURT |
| COMPUWEIGH CORPORATION<br>Plaintiff, | J.D. OF WATERBURY |
| V. | |
| HONEYWELL INTERNATIONAL, INC.,<br>& SCAN SOURCE, INC.<br>Defendants. | AT WATERBURY<br><br>JUNE 1, 2016 |

## COMPLAINT

**The Parties**

1. CompuWeigh Corporation ("CompuWeigh"), is and was at all relevant times hereto a corporation organized and existing under the laws of the State of Connecticut, with a business address of 50 Middle Quarter Road in Woodbury, Connecticut.

2. Defendant Honeywell International, Inc. ("Honeywell") is and was at all relevant times hereto a corporation organized and existing under the laws of the State of Delaware, with a business address of 115 Tabor Road in Morris Plains, New Jersey.

3. ScanSource, Inc. ("ScanSource") is and was at times relevant hereto a dealer, agent, partner and/or affiliate of Intermec Technologies Corporation ("Intermec") and Honeywell with an office at 300 Airborne Parkway, Cheektowaga, NY.

4. Intermec ("Intermec") was at all relevant times hereto a corporation organized and existing under the laws of the State of Washington and licensed to do business within the State of Connecticut. Upon information and belief, Honeywell acquired Intermec in September of 2013 and is a successor to Intermec that assumed, both expressly and as a matter of law, the obligations of Intermec to CompuWeigh with respect to the products that are the subject of this

action.

**Background Facts**

5. CompuWeigh is a corporation which specializes in automating grain facilities.

6. Prior to June 2013, CompuWeigh supplied OMRON readers to its customers.

7. These readers use an antenna to read a chip in an identification card. "Reading" that chip gives information about the holder of that particular identification card on the CompuWeigh system, similar to a bar code or label which would give information about a product.

8. After research and deliberation, CompuWeigh considered purchasing Intermec readers (model IF2) ("product" or "readers"), which were available through ScanSource, an affiliate and authorized distributor of Intermec and Honeywell products.

9. CompuWeigh communicated with Intermec, Honeywell and ScanSource representatives about the subject readers and their intended use, and relied upon their claims of knowledge, expertise, advice and representations regarding the Intermec product in ultimately selecting the readers at issue.

10. The product is and was at all relevant times designed to read a variety of radio frequency identification ("RFID") tags and was intended and advertised as being suitable for industrial and enterprise environments.

11. CompuWeigh informed Intermec of its intended use for the products and based upon their knowledge, expertise, advice and representations, submitted three purchase orders for the readers from ScanSource, in June 2013, March 2014 and May 2014.

12. CompuWeigh purchased one hundred and sixty-five (165) readers in total.

13. After receiving the first batch of readers, CompuWeigh incorporated these readers

on their own systems, which were shipped them out to its customers beginning in March 2014.

14. Between April and August 2014, CompuWeigh shipped nineteen (19) units back to Honeywell for repair.

15. The defendants denied that there was any defect in the product or any issue relating to their suitability for the use to which they were being put.

16. In September 2014, thirteen (13) additional units failed for various CompuWeigh customers. The defendants continued to deny that there was any defect in the product or any issue relating to their suitability for the use to which they were being put.

17. Between October 2014 and March 2015, CompuWeigh sent eighty-eight (88) readers back to Honeywell for repair. The defendants continued to deny that there was any defect in the product or any issue relating to their suitability for the use to which they were being put.

18. In or about November 2014, As a result of the rapid and high failure rate, Honeywell sent CompuWeigh thirty (30) readers which could be used as spare parts in the event of a failure.

19. CompuWeigh sent these spare readers to a majority of their customers who experienced a failure, in order to keep them operating while the other readers were being repaired. CompuWeigh paid the overnight shipping costs for both the failed readers to be shipped to and from the customer sites, and the spare readers to be shipped to its customers.

20. In April 2015, Honeywell notified CompuWeigh that it had modified the product to correct the cause of the failures and had tested said modification.

21. In order to take advantage of the modification, CompuWeigh was required to arrange for shipping of the faulty readers from its customers back to Honeywell so that the defective part could be replaced. CompuWeigh could then redistribute the products to its

customers.

22. Based on the representations that Honeywell could fix the product, CompuWeigh began to send back faulty readers to Honeywell as its clients returned them.

23. Once CompuWeigh received the modified readers from Honeywell, CompuWeigh shipped them out to its customers, who then replaced the product. CompuWeigh was required to provide technical support and process the paperwork and pay for expedited shipping costs to send back the faulty units and send the new units to its customers.

24. Despite the modification to the readers, the units continued to fail.

25. In November 2015, Honeywell sent out two engineers to one of the customer sites to troubleshoot the issue. After their visit, Honeywell suggested that CompuWeigh should add back the surge suppressors, which Honeywell had originally suggested that they remove from all readers, despite the lack of evidence that the surge suppressors were related in any way to their failure.

26. Relying on Honeywell's assurances, CompuWeigh continued to incur costs in connection with the repair and replacement of the units.

27. As a result of these failures, CompuWeigh's customers were running in manual mode, rather than using the SmartTruck system, which negatively affected their productivity during the harvest season.

28. In addition, CompuWeigh has suffered and continues to suffer significant damage in the form of harm to its reputation with its customers, as well as lost opportunities in the form of lost customers and lost sales because of customer dissatisfaction and CompuWeigh's inability to solve the problems associated with the defect and meet its customers' expectations.

29. Ultimately, in December 2015, after continued failures, Honeywell began to insist

that the product was being used out of specification. CompuWeigh was forced to purchase OMRON readers at an additional cost and subsequently send out their own representatives to install those readers, rather than continue to troubleshoot the products from Honeywell.

30. From the initial receipt of the readers through March 2016, CompuWeigh experienced three hundred and twenty-eight (328) failures.

31. CompuWeigh has continued to replace its customers' defective Honeywell readers with OMRON readers at an average cost of approximately $3,600 per unit, including labor, materials and travel expenses.

**First Count (Breach of Implied Warranty of Fitness for a Particular Purpose):**

1-31. Paragraphs 1 through 31 are hereby incorporated by reference and made Paragraphs 1 through 31 of this First Count.

32. ScanSource, Intermec, and Honeywell, are sellers, dealers and "merchants" of the subject readers.

33. The subject readers were intended and represented to be merchantable and fit for a particular purpose, namely to be suitable RFID readers for use in the commercial trucking industries.

34. From the onset of their communications with CompuWeigh, Intermec, Scansource, and Honeywell knew of the particular purpose for which the goods were being bought by the plaintiff.

35. Despite the defendants' representations and express and implied promises, and the parties' course of dealing which established CompuWeigh's expectations and understandings and the parties' mutual understandings of the market, customers, use, application and intended use of the products, the goods were not fit for the purpose for which they were intended to be used and

were being used.

36. CompuWeigh relied on the defendants' skill and knowledge, and their express and implied promises, representations and warranties in selecting the readers, in continuing to use the readers and incurring costs in relation to repairing and replacing the readers.

37. CompuWeigh gave notice of the defective products as it became aware of the failures.

38. The plaintiff has suffered injury and damages.

39. Said injury and damages were incurred as a result of the defective nature of the product.

**Second Count (Breach of Implied Warranty of Merchantability):**

1-39. Paragraphs 1 through 39 of the First Count are hereby incorporated by reference and made Paragraphs 1 through 39 of this Second Count.

40. The products were represented to be fit for a particular purpose for which they were used.

41. Despite the defendants' representations and express and implied promises, and the parties' course of dealing which established CompuWeigh's expectations and understandings and the parties' mutual understandings of the market, customers, use, application and intended use of the product, the goods were not fit for that purpose.

42. The defect or failure of these products amounts to a breach of the implied warranty of merchantability.

43. CompuWeigh gave notice of the defective products as it became aware of the failures.

44. The plaintiff has suffered injury and damages.

45. Said injury and damages were incurred as a result of the defective nature of the product.

**Third Count (Breach of Express Contract):**

1-39. Paragraphs 1 through 39 of the First Count are hereby incorporated by reference and made Paragraphs 1 through 39 of this Third Count.

40. Plaintiff and defendants entered into agreements whereby plaintiff would purchased the subject readers in exchange for payment.

41. Pursuant to the terms of the agreement, plaintiff was entitled to receive fully functional, non-defective products.

42. Upon receipt of products, Plaintiff paid defendant pursuant to said agreement.

43. Defendants did not tender functional products despite full payment by the plaintiff.

44. After being notified of the defects, defendants agreed to repair the readers so that they would function as promised and agreed.

45. CompuWeigh relied upon the defendants' promises and representations in continuing to use the readers, incorporating them into CompuWeigh's products and continuing to supply and sell them to its customers.

46. Despite defendants' promises that the units had been repaired and that the source of the failures had been corrected, the units continued to fail.

47. Plaintiff has suffered injury and damages as a consequence of the defendants' breaches.

**Fourth Count (Breach of Implied Contract):**

1-39. Paragraphs 1 through 39 of the First Count are hereby incorporated by reference and made Paragraphs 1 through 39 of this Fourth Count.

40. Plaintiff and defendants entered into agreements whereby plaintiff would purchased the subject readers in exchange for payment.

41. Pursuant to the terms of the agreement, plaintiff was entitled to receive fully functional, non-defective products and was to have the right to prompt repair or replacement of defective units.

42. Defendants represented and promised that the readers were merchantable, fit for their intended purpose, free of defects.

43. Upon receipt of products, Plaintiff paid defendant pursuant to said agreement.

44. Defendants did not tender functional products despite full payment by the plaintiff.

45. After being notified of the repeated defects, defendants continued to provide assurances that they would repair the units and that they had found and corrected the reasons for the failures.

46. Defendants agreed that they would continue to repair units as necessary and take other steps that would enable CompuWeigh to meet its customers needs and expectations if CompuWeigh continued to use and supply the defendants' readers.

47. CompuWeigh relied upon the defendants' promises and representations in continuing to use the readers, incorporating them into CompuWeigh's products and continuing to supply and sell them to its customers.

48. Despite defendants' promises that the units had been repaired and that the source

of the failures had been corrected, the units continued to fail.

49. Plaintiff has suffered injury and damages as a consequence of the defendants' breaches.

**Fifth Count (Unjust Enrichment):**

1-49. Paragraphs 1 through 49 of the Fourth Count are hereby incorporated by reference and made Paragraphs 1 through 49 of this Fifth Count.

50. Plaintiff was entitled to receive fully functional, non-defective products.

51. The defendants did not tender fully functional and non-defective products despite full payment by the plaintiff.

52. The defendants have retained the benefit of CompuWeigh's payment for the products, to which they are not justly entitled.

**Sixth Count (Innocent Misrepresentation):**

1-52. Paragraphs 1 through 52 of the Fifth Count are hereby incorporated by reference and made Paragraphs 1 through 52 of this Sixth Count.

53. Defendants made material representations that the products at issue were not defective.

54. Defendants made further material representations that it would repair any defective products.

55. Defendants further represented that they had adequately tested and re-designed the defective products.

56. Plaintiff reasonably relied on the material representations of Defendants when it continued to accept products from the defendants.

57. Defendants had a duty to know, knew or should have known that their

representations that the products were repaired was erroneous.

58. Plaintiff suffered injury and damages as a result of Defendants representations.

**Seventh Count (Negligent Misrepresentation):**

1-58. Paragraphs 1 through 58 of the Sixth Count are hereby incorporated by reference and made Paragraphs 1 through 58 of this Seventh Count.

59. Defendants failed to exercise reasonable care in obtaining or communicating the information it represented to the plaintiff.

60. Defendants supplied the information knowing that it would induce the plaintiff to act in reliance upon said information.

61. Plaintiff relied upon said information to its detriment.

62. Plaintiff suffered injury and damages as a result of its reliance on Defendants' representations.

**Eighth Count (Intentional Misrepresentation):**

1-62. Paragraphs 1 through 62 of the Seventh Count are hereby incorporated by reference and made Paragraphs 1 through 62 of this Eighth Count.

63. Initially, Defendants made representations that its product was not defective.

64. Defendants then made representations to the plaintiff that any defect in the product would be fixed.

65. Defendants made additional representations that the product had been properly modified and that said modification had been tested and that it had fixed the defective nature of the product.

66. Defendants knew that these representations were false.

67. Plaintiff reasonably relied on these material representations made by Defendants.

68. Plaintiff suffered ascertainable losses as a result of its reliance on Defendants' representations.

**Ninth Count (CUTPA):**

1-68. Paragraphs 1 through 68 of the Eighth Count are hereby incorporated by reference and made Paragraphs 1 through 68 of this Ninth Count.

69. Defendants' conduct constituted a breach of contract, accompanied by aggravating circumstances, including, but not limited, to the following:

   a. Defendants, in effect, strung Plaintiff along for over eighteen (18) months, representing that the products were not defective, and later, that the defective products would be fixed;

   b. accepting payments pursuant to the agreement between the parties and then failing to provide non-defective products;

   c. requiring CompuWeigh to incur shipping and other costs based on the representation that the defect would be corrected;

   d. making representations that the defect was corrected when they knew that the defect was not fixed;

70. Defendants' practices, methods and actions as described herein offend public policy, are unfair, deceptive, unethical, oppressive, unreasonable and/or outrageous and did, in fact, cause Plaintiff damages, injury and violated its rights as they exist by statute, and principles of law and equity.

71. Plaintiff has suffered ascertainable losses as a result of the defendants' conduct.

WHEREFORE, the plaintiff claims the following relief:

1. Fair, just and reasonable damages.
2. Incidental and consequential damages.
3. Attorney's fees and costs pursuant to 42-110g, *et seq.*
4. Such other and further relief as the Court deems just and equitable.

THE PLAINTIFF,
COMPUWEIGH

By *[signature]*
Jeffrey J. Tinley
Amita P. Rossetti
Tinley, Renehan & Dost, LLP
60 North Main Street, 2nd Floor
Waterbury, CT 06702
Juris No. 402031
Telephone: (203) 596-9030
Facsimile: (203) 596-9036
E-Mail: jtinley@tnrdlaw.com

RETURN DATE: JULY 5, 2016 : SUPERIOR COURT

COMPUWEIGH CORPORATION :
    Plaintiff, : J.D. OF WATERBURY

V. :

HONEYWELL INTERNATIONAL, INC., : AT WATERBURY
& SCANSOURCE,
    Defendants. : JUNE 1, 2016

## STATEMENT OF AMOUNT IN DEMAND

The amount in demand, exclusive of interest and costs, is in excess of FIFTEEN THOUSAND DOLLARS ($15,000.00).

           THE PLAINTIFF,
           COMPUWEIGH

           By_____
           Jeffrey J. Tinley
           Amita P. Rossetti
           Tinley, Renehan & Dost, LLP
           60 North Main Street, 2nd Floor
           Waterbury, CT 06702
           Juris No. 402031
           Telephone: (203) 596-9030
           Facsimile: (203) 596-9036
           E-Mail: jtinley@tnrdlaw.com